**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

GARY L. SPEARS,                    ) Case No. EDCV 16-2333-JPR
                                   )
                    Plaintiff,     )
                                   ) **MEMORANDUM DECISION AND ORDER**
          v.                       ) **AFFIRMING COMMISSIONER**
                                   )
NANCY A. BERRYHILL, Acting         )
Commissioner of Social             )
Security,[1]                       )
                                   )
                    Defendant.     )
_____)

## I.    PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying his application for supplemental security income benefits ("SSI"). The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed September 28, 2017, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is affirmed.

---

[1] Nancy A. Berryhill is substituted in as the correct Defendant. <u>See</u> Fed. R. Civ. P. 25(d).

1

## II. BACKGROUND

Plaintiff was born in 1958. (Administrative Record ("AR") 33, 47, 187.) He completed three years of college (AR 210) and last worked as a "sorter operator" (AR 231).

On October 16, 2012, Plaintiff filed an application for SSI, alleging that he had been disabled since February 1, 2005, because of diabetes, "peripheral arterial disease of the legs," and inability to "control bowels." (AR 33, 47, 187, 209, 618.) After his application was denied initially (AR 59) and on reconsideration (AR 66), he requested a hearing before an Administrative Law Judge (AR 72). A hearing was held on October 21, 2014, at which Plaintiff, who was represented by counsel, testified. (AR 600-32.) Supplemental hearings were held on February 17 and July 13, 2015. (See AR 23-32, 572-99.) In a written decision issued July 17, 2015, the ALJ found Plaintiff not disabled. (AR 9-22.) Plaintiff requested review from the Appeals Council, and on October 20, 2016, it denied review. (AR 1-4.) This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

It is more than a scintilla but less than a preponderance.
Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
substantial evidence supports a finding, the reviewing court
"must review the administrative record as a whole, weighing both
the evidence that supports and the evidence that detracts from
the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,
720 (9th Cir. 1998).  "If the evidence can reasonably support
either affirming or reversing," the reviewing court "may not
substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or has lasted, or is expected to
last, for a continuous period of at least 12 months.  42 U.S.C.
§ 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to
assess whether a claimant is disabled.  20 C.F.R.
§ 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir.
1995) (as amended Apr. 9, 1996).  In the first step, the
Commissioner must determine whether the claimant is currently
engaged in substantial gainful activity; if so, the claimant is
not disabled and the claim must be denied.  § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful
activity, the second step requires the Commissioner to determine

3

whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied. § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform his past work; if so, he is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy.

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

4

§ 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 416.920(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

      B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date. (AR 11.) At step two, he concluded that Plaintiff had the following severe impairments: "diabetes mellitus; diabetic neuropathy; ulceration of the right foot; peripheral vascular disease; and macular edema." (<u>Id.</u>) At step three, he found that Plaintiff did not have an impairment or combination of impairments falling under a Listing. (AR 12.) He expressly considered Listing 4.12 (peripheral arterial disease), among others. (<u>Id.</u>)

At step four, the ALJ found that Plaintiff had the RFC to perform modified light work:

> [He] can lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk for two hours out of an eight-hour workday with regular breaks. He must change positions between standing and walking. He can sit for six hours out of an eight-hour workday with regular breaks. He is unlimited with respect to pushing and/or pulling, other than as indicated for lifting and/or carrying. He can frequently reach with the bilateral upper extremities. He can continuously handle, feel, finger and push and pull with the upper extremities. He can occasionally push and pull and use foot controls with the lower extremities. He cannot

5

climb ladders, ropes or scaffolds.  He can occasionally
climb ramps and stairs, balance, stoop, kneel, crouch and
crawl.  He is precluded from reading small print, but
ordinary newspapers and books is permissible.  He is
precluded from work at unprotected heights.  He can
occasionally operate motor vehicles.  He cannot operate
moving mechanical parts or machinery.  He is precluded
from exposure to humidity, wetness or extreme cold, heat
and vibratory tools.  He is limited to occasional
exposure to fumes, dust, odors or pulmonary irritants.
(Id.)  Based on the VE's testimony, the ALJ concluded that
Plaintiff could perform his past relevant work as a "[p]roof-
machine operator," DOT 217.382-010, 1991 WL 671944, as actually
and generally performed in the regional and national economy.
(AR 17.)  Thus, the ALJ found Plaintiff not disabled.  (AR 17-
18.)

**V.   DISCUSSION**

Plaintiff argues that the ALJ erred in (1) evaluating the
opinion of testifying medical expert Minh Vu-Dinh (J. Stip. at 3-
6) and (2) finding that Plaintiff could perform his past relevant
work despite an alleged unexplained inconsistency between the DOT
and the ALJ's RFC determination (J. Stip. at 6-9, 11).  For the
reasons discussed below, however, the ALJ did not err.

A.   The ALJ Properly Rejected Dr. Vu-Dinh's Opinion

Dr. Vu-Dinh testified that Plaintiff's impairments equaled
Listing 4.12.  (AR 579.)  The ALJ gave that opinion "little
weight" and rejected it, finding at step three of the sequential
evaluation process that Plaintiff's impairments did not meet or

6

equal any listed impairment, including Listing 4.12. (AR 12, 16.) Plaintiff argues that the ALJ erred because he "did not explain why he gave greater weight" to the opinions of consulting medical expert Thomas Tarnay and state-agency consultants G. Taylor and A. Pan. (See J. Stip. at 4.) Further, though Plaintiff has not challenged the ALJ's step-three finding (see generally J. Stip. at 3-6), the Court construes his briefing liberally to include a challenge to it because that finding was undoubtedly based in part on the ALJ's rejection of Dr. Vu-Dinh's opinion.

### 1. Applicable law

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. Lester, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's. Id.; see § 416.927.[3] But "the findings of a nontreating, nonexamining

---

[3] Social Security regulations regarding the evaluation of opinion evidence were amended effective March 27, 2017. When, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision. See Lowry v. Astrue, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); Spencer v. Colvin, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking."). Accordingly, citations to

7

physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended). Moreover, because a testifying medical expert is subject to cross-examination, his opinion may be given greater weight. Andrews v. Shalala, 53 F.3d 1035, 1042 (9th Cir. 1995).

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008). When a physician's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for "clear and convincing" reasons. Magallanes, 881 F.2d at 751; Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). The weight given a treating or examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. § 416.927(c)(3)-(6). Those factors also determine the weight afforded the opinions of nonexamining physicians. § 416.927(e). The ALJ considers findings by state-agency medical consultants and experts as opinion evidence. Id.

Furthermore, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and

20 C.F.R. § 416.927 are to the version in effect from August 24, 2012, to March 26, 2017.

8

inadequately supported by clinical findings." <u>Thomas v.</u>
<u>Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>accord</u> <u>Batson v.</u>
<u>Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004).
An ALJ need not recite "magic words" to reject a physician's
opinion or a portion of it; the court may draw "specific and
legitimate inferences" from the ALJ's opinion. <u>Magallanes</u>, 881
F.2d at 755. The Court must consider the ALJ's decision in the
context of "the entire record as a whole," and if the "'evidence
is susceptible to more than one rational interpretation,' the
ALJ's decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>,
528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

Listing 4.12 requires the following:

Peripheral arterial disease,[4] as determined by
appropriate medically acceptable imaging, causing
intermittent claudication[5] and one of the following:

A. Resting ankle/brachial systolic blood pressure ratio
of less than 0.50.

OR

B. Decrease in systolic blood pressure at the ankle on
exercise of 50 percent or more of pre-exercise level and
requiring 10 minutes or more to return to pre-exercise

[4] Peripheral arterial disease is the narrowing of blood
vessels outside of the heart. <u>See</u> <u>Peripheral Arterial Disease</u>,
MedlinePlus, https://medlineplus.gov/
peripheralarterialdisease.html (last updated July 17, 2017).

[5] Claudication is pain caused by too little blood flow and
generally affects the blood vessels in the legs. <u>See</u>
<u>Claudication</u>, Mayo Clinic, https://www.mayoclinic.org/diseases-
conditions/claudication/symptoms-causes/syc-20370952 (last
updated Jan. 31, 2015).

level.

OR

C.  Resting toe systolic pressure of less than 30 mm Hg.

OR

D.  Resting toe/brachial systolic blood pressure ratio of
less than 0.40.

20 C.F.R. pt. 404, subpt. P, app. 1 § 4.12.

### 2.  Relevant background

#### a.  *Dr. Vu-Dinh*

Dr. Vu-Dinh, an internist, testified as a medical expert at
Plaintiff's February 17, 2015 supplemental hearing.  (See AR
572.)  He found that the medical evidence supported "three
serious problems": "peripheral vascular disease," diabetes-
related "foot ulcerations," and "diabetes with . . . early
polyneuropathy."  (AR 577-78.)  He concluded that Plaintiff
equaled "Listing 4.12 for the peripheral vascular disease."  (AR
579.)

Dr. Vu-Dinh nonetheless noted that the peripheral vascular
disease was "corrected in all of the places," apparently by a
stent, but he "[wasn't] sure the stent [was] working because
. . . they couldn't do the ABI."[6]  (AR 579-80.)  He stressed that
an ABI indicated the "ratio between the regular artery and the
ankle artery" (AR 577) and that he "depend[ed] . . . on [it]" in

---

[6] The ankle-brachial index test for peripheral arterial
disease compares the systolic blood pressure at the arteries near
the ankles with the systolic blood pressure in the arms.  Ankle-
Brachial Index, Mayo Clinic, https://www.mayoclinic.org/
tests-procedures/ankle-brachial-index/basics/definition/
PRC-20014625?p=1 (last updated Jan. 10, 2018).

cases like this (AR 579).  He stated that without the ABI he couldn't "say for sure . . . how severe" the peripheral vascular disease was.  (AR 583.)  But if it had been performed, Dr. Vu-Dinh testified, he thought Plaintiff "would have an ABI consistent with the 4.12 listing."  (AR 584; see also AR 577 ("I think had [the ABI] been performed, I expect the result would be positive.").)

In making that conclusion, Dr. Vu-Dinh relied on an ulceration from 2013, which he found "indicat[ed] that [Plaintiff's] profusion [was] still very poor."  (AR 579-80.)  He explained that in his experience poor profusion, or poor flow to the lower extremities, "would, itself, equal" Listing 4.12.  (AR 584-85.)  He conceded that the ulcer did not last for over 12 months (AR 580-81), but he also expected Plaintiff's susceptibility to ulceration to be "permanent" because the first one "requir[ed] such a tremendous amount of treatment," including "hyperbaric oxygen."  (Id.)  Dr. Vu-Dinh further stated that Plaintiff's profusion was "not restored completely yet" (AR 582) but mentioned that there was evidence that "the profusion ha[d] also been corrected" (AR 581).  He did not specify where in the record that evidence was.

After hearing Dr. Vu-Dinh's testimony, the ALJ found that his "credibility d[id] not appear to be germane because he, himself, [was] relying upon an ulceration that . . . he admitted didn't take a year" and "should not be coupled with something else that [was] not there."  (AR 598.)  The ALJ stated that he intended to get the opinion of "another doctor" "to see whether or not he comes back the same as Dr. Vu[-Dinh]."  (Id.)

11

b. *Dr. Tarnay*

In April 2015, Dr. Tarnay responded to a medical interrogatory sent by the ALJ, who contacted him the month after receiving Dr. Vu-Dinh's testimony. (AR 544, 559-67.) Dr. Tarnay found that Plaintiff had "[l]ower extremity vascular disease," and in support of his conclusion he identified stents placed in Plaintiff's "common iliac vessels," angioplasties in his "left popliteal and left posterior tibial vessels," a "leg ulcer on the left foot," and a "plantar infection on the right foot requiring hyperbaric oxygenation." (AR 559.) He concluded that Plaintiff did not meet any Listing. (AR 560.) "The problem," Dr. Tarnay stated, was that there was "no direct data to quantify 4.12." (Id.) An "exercise test was not done," and "reliable ankle-brachial indices could not be obtained." (Id.) He stated that notes of Plaintiff's ankle pressure at "200+ mean[t] the vessels were too stiff to be compressed; thus the measurements were invalid." (Id.)

He also determined that Plaintiff did not equal Listing 4.12. Clarifying that his opinion "rest[ed] on inference," he stated that "if pressures in [Plaintiff's] toes could be measured they would very likely be above 40 and not meet the listing." (Id.) He considered the stents placed in Plaintiff's iliac vessels, the lack of significant distal disease "on the right," the angioplasties in two different locations "on the left," the healed ischemic ulcer, the healed right infection from a foreign body, and "[t]riphasic waveforms at the groins," indicating "adequate inflow." (Id.)

Dr. Tarnay then assessed Plaintiff with certain functional

limitations, agreeing with the light-work RFC assessment provided by orthopedic surgeon and consulting examiner Anh Tat Hoang on March 18, 2013. (AR 561-67; see also AR 370-73.)

Although Plaintiff's counsel was served with Dr. Tarnay's opinion (AR 246-47), he had "no comment to make" and did not request a supplemental hearing, the right to cross-examine him, or anything else (AR 249; see also AR 15 (ALJ so noting)).

### c. *State-agency physicians*

In April 2013, internist Taylor reviewed Plaintiff's medical records. (AR 33-46.) He found that Plaintiff had the following severe impairments: diabetes mellitus, an open wound on his lower limb, and peripheral arterial disease. (AR 40.) He considered Listing 4.12 for peripheral arterial disease (id.) but found Plaintiff not disabled (AR 45).

In October 2013, general practitioner Pan reviewed Plaintiff's medical records. (AR 47-58.) He found the same severe impairments as Dr. Taylor and, after considering Listing 4.12 (AR 52), found Plaintiff not disabled (AR 56).

### 3. Analysis

The ALJ attributed "little weight" to Dr. Vu-Dinh's opinion, "great weight" to Dr. Tarnay's opinion, and "some weight" to the opinions of Drs. Taylor and Pan. (AR 16.) None of the doctors had examined Plaintiff. Because Dr. Vu-Dinh's opinion was contradicted, the ALJ was required to provide a "specific and legitimate" reason for rejecting it. See Carmickle, 533 F.3d at 1164. He did so.

The ALJ stated that Dr. Vu-Dinh's opinion was "not consistent" with Dr. Tarnay's, to which he assigned greater

weight.  (AR 16.)  Moreover, the ALJ found Dr. Vu-Dinh not

credible because he relied on an ulceration that didn't last a

year and "should not [have been] coupled with something else that

[was] not there," apparently referring to nonexistent test

results of the sort listed in 4.12 and possibly to the widespread

profusion Dr. Vu-Dinh believed might exist.  (AR 598.)  That was

a proper basis for rejecting the opinion.  See Kohansby v.

Berryhill, 697 F. App'x 516, 517 (9th Cir. 2017) (upholding

inconsistency with medical-opinion evidence as specific and

legitimate reason for rejecting medical opinion (citing

Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008))); see

also Sousa v. Callahan, 143 F.3d 1240, 1244 (9th Cir. 1998)

("[ALJ] may reject the opinion of a non-examining physician by

reference to specific evidence in the medical record.").

The ALJ's credibility assessment reflected other problems he

found with Dr. Vu-Dinh's testimony, including his "unclearly

understanding the questions" and offering inconsistent answers.

(See AR 597.)  Dr. Vu-Dinh, for example, stated that Plaintiff's

"profusion [was] not restored completely yet" (AR 582) but that

some evidence indicated his profusion had been "corrected" (AR

581).  He also stated that he "d[idn't] have the proof that

[Plaintiff] still ha[d] a problem" with "poor flow."  (AR 585.)

His statement that he could not "say for sure" "how severe"

Plaintiff's condition was further contradicted his statements

that Plaintiff's condition "would equal" Listing 4.12.  (See AR

583-84); see also De Guzman v. Astrue, 343 F. App'x 201, 208 (9th

Cir. 2009) (recognizing "inconsistent statements" as specific and

legitimate reason for discounting medical opinion); Donathan v.

<u>Astrue</u>, 264 F. App'x 556, 560 (9th Cir. 2008) (same).

2      Plaintiff argues that the ALJ failed to explain his

3   reasoning, "ma[king] no mention of listing 4.12" and "offer[ing]

4   no assessment as to how the medical evidence supports Dr.

5   Tarnay's opinion." (J. Stip. at 4.)  But Plaintiff is mistaken.

6   In the paragraphs immediately preceding his rejection of Dr. Vu-

7   Dinh's opinion, the ALJ thoroughly discussed Dr. Tarnay's

8   evaluation of Listing 4.12 and his specific findings. (<u>See</u> AR

9   15-16.)  Indeed, as explained below, a review of the entire

10  record reveals that the ALJ's reliance on Dr. Tarnay's opinion

11  was supported by substantial evidence. <u>See</u> <u>Lester</u>, 81 F.3d at

12  831 (ALJ may reject medical-source opinion in favor of

13  conflicting, nonexamining physician's opinion as long as that

14  determination is "supported by <u>substantial record evidence</u>"

15  (emphasis in original) (citation omitted)).

16              a.   *Meeting Listing 4.12*

17      To meet Listing 4.12, a claimant must point to (1)

18  "medically acceptable imaging" supporting a diagnosis of

19  peripheral arterial disease with claudication and (2) blood-

20  pressure measurements, which can be obtained through a variety of

21  methods. <u>See</u> 20 C.F.R. pt. 404, subpt. P, app. 1 § 4.12.  No

22  party contends that Plaintiff met the listing. (<u>See generally</u> J.

23  Stip.)  As stated by the ALJ (AR 16), Dr. Tarnay assessed

24  Plaintiff with peripheral arterial disease, based on an

25  arteriogram from July 2010 (AR 559 (citing AR 315); <u>see also</u> AR

26  493 (Mar. 2014 imaging report of bilateral lower extremities

27  showing "[p]ositive findings for peripheral arterial disease in

28  the right lower extremity" and "negative" for left)).  Though a

medically documented finding of that disease satisfied one of the
criteria under Listing 4.12, Dr. Tarnay found that Plaintiff's
impairments "neither singly nor in combination met" Listing 4.12
because "there [was] no direct data to support [it,] as an
exercise test was not performed and reliable ankle-brachial
indices could not be obtained." (AR 16 (citing AR 560).)
Plaintiff does not contend otherwise. (See generally J. Stip. at
2-5 (arguing only about whether Plaintiff "equaled" Listing
4.12).)

Indeed, Plaintiff's medical records indicate that he had a
"history of vessel non-compliance," which prevented "pressures"
from being measured accurately (AR 488 (Sept. 2014)), as Dr.
Tarnay found (see, e.g., AR 432-33 ("Vessel noncompliance
indicated bilaterally [in Mar. 2014]."), 560 (Dr. Tarnay noting
"invalid" measurements because vessels "were too stiff to be
compressed")). Accordingly, the record contains no findings
regarding Plaintiff's ankle-brachial blood pressures that would
satisfy the requirements of Listing 4.12, a fact Dr. Vu-Dinh
himself acknowledged. (AR 579-80.) In making his step-three
determination, the ALJ noted that there were no "medical findings
that [were] the same [as] those of any listed impairment." (AR
12.) Substantial evidence therefore supports the conclusion that
Plaintiff's impairments did not meet Listing 4.12. See Sullivan
v. Zebley, 493 U.S. 521, 530 (1990) (holding that "[f]or a
claimant to show that his impairment matches a listing, it must
meet all of the specified medical criteria" and that "[a]n
impairment that manifests only some of those criteria, no matter
how severely, does not qualify" (emphasis in original)),

superseded by statute on other grounds as stated in <u>Kennedy v.</u>
<u>Colvin</u>, 738 F.3d 1172, 1174 (9th Cir. 2013).

> b. *Equaling Listing 4.12*

To equal a listing, a claimant must establish "symptoms,
signs and laboratory findings 'at least equal in severity and
duration' to the characteristics of a relevant listed
impairment." <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1099 (9th Cir.
1999) (quoting § 404.1526); <u>see also</u> § 416.926. The ALJ found
that "[n]o treating or examining physician ha[d] recorded
findings equivalent in severity to the criteria of any listed
impairment, nor d[id] the evidence show medical findings that
[were] equivalent to those of any listed impairment." (AR 12.)
He specifically discussed Dr. Tarnay's findings that Plaintiff's
"ischemic ulcer" and right-foot "infection . . . due to a foreign
body" had healed. (AR 16; <u>see also</u> AR 560.) At the February
2015 hearing, he also noted that the ulcer had not lasted for 12
months. (AR 598.)

Indeed, the record reveals that Plaintiff had no ulcers
prior to the October 2012 application date (<u>see</u> AR 280 (June
2010: "[n]o lesions or ulcerations"), 287-88 (July 2010:
"[Plaintiff] denies any ulcers of his feet")), but in January
2013 he was diagnosed with a "non[]healing ulcer" on his right
foot, which he had had for two months (<u>see</u> AR 322, 328, 341, 345,
347-48). The ulcer was apparently caused by a "metallic foreign
body in the soft tissue" of his foot. (AR 363.) By February,
the ulcer was "much improved and healing well," and Plaintiff
reported "0/10" pain. (AR 391-92.) By March, it was "healing"
and "improved" with antibiotics and "hyperbaric therapy." (AR

372, 375, 382.) By April, it was noted as "improving" and "d[id] not appear infected." (AR 537.) And by June, the "wound [was] completely healed." (AR 532; see also AR 457 (Feb. 2014 note indicating that right-foot ulcer "healed uneventfully"), 455 (Mar. 2014 note indicating "right-sided ulcer" "heal[ed] on its own" and Plaintiff was "asymptomatic").) No additional ulcers were noted in the record thereafter. (See, e.g., AR 450 (Jan. 2014: "[n]o ulcers"), 458 (Feb. 2014: no abnormalities noted other than calluses on both feet), 454 (Mar. 2014: "no ulcerations").)[7]

Dr. Vu-Dinh concluded that Plaintiff's ABI-pressure readings would likely "be positive" and "equal" Listing 4.12 because his ulcer and the "tremendous amount of treatment" it required indicated "poor profusion." (AR 577, 580-81, 584.) But Dr. Vu-Dinh also stated, contradictorily and without further elaboration, that some evidence in the record indicated that "the profusion ha[d] been corrected." (AR 581.) Indeed, Dr. Tarnay stated that "[t]riphasic waveforms at the groins infer[red] adequate inflow" and thus normal profusion.[8] (AR 560; see also AR 488-89 (Sept. 2014 medical-imaging report).) And to the

---

[7] During the February 2015 hearing, Dr. Vu-Dinh admitted that the ulcer did not last for a period of at least 12 months (AR 580-81), which was clearly evidenced in the record and further supports the ALJ's rejection of his opinion. As the ALJ noted at the hearing, "Dr. Vu-Dinh's credibility does not appear to be germane because he, himself, is relying upon an ulceration that . . . he admitted didn't take a year." (AR 598.)

[8] Triphasic waveforms are associated with normal blood flow, while biphasic and monophasic waveforms are considered abnormal. See Ayush Goel et al., Doppler Waveforms, Radiopaedia, https://radiopaedia.org/articles/doppler-waveforms (last visited Jan. 31, 2018).

extent that Dr. Vu-Dinh considered Plaintiff's ulcer-related treatment "tremendous," Dr. Tarnay noted the hyperbaric-oxygen treatment as evidence of the peripheral vascular disease itself (AR 559), and the record contains characterizations by other doctors of the treatment as "conservative" (AR 570 (vascular surgeon stating that Plaintiff's "diabetic foot ulcer healed with conservative management"); see also AR 455, 457). Thus, as the ALJ pointed out, Dr. Tarnay opined that Plaintiff's impairments did not equal Listing 4.12 and that "if the . . . pressure in his toes could be measured they would likely be above 40" and not satisfy the Listing. (AR 16; see also AR 560.)

State-agency consultants Taylor and Pan, who reviewed Plaintiff's medical records through April and October 2013, respectively, and hence had access to Plaintiff's ulcer-related treatment notes, also found that his condition did not satisfy Listing 4.12. (AR 40-45, 52-57; see also AR 16 (ALJ relying on inconsistency with state-agency consultants' opinions as additional reason for rejecting Dr. Vu-Dinh's opinion).) Because the ALJ's reliance on Dr. Tarnay's equivalency conclusion over Dr. Vu-Dinh's was supported by substantial evidence in the record and was reasonable, the Court should not "second guess[]" that determination. Thomas, 278 F.3d at 959.

           c.   *Reviewing the medical record in its entirety*

The ALJ offered an additional reason for discounting Dr. Vu-Dinh's opinion: unlike Dr. Tarnay, he "did not have the benefit of reviewing the medical record in its entirety." (AR 16.) That can be a specific and legitimate reason. Cf. Glasgow v. Astrue, 360 F. App'x 836, 837 (9th Cir. 2009) (as amended Mar. 11, 2010)

(nonexamining physician's "sole review of the entire record," among other reasons, was "sufficient to overcome the general rule" that nonexamining doctor's opinion should be given less weight than examining or treating doctor's).

But as Plaintiff argues, the ALJ failed to explain how the additional evidence reviewed by Dr. Tarnay and not reviewed by Dr. Vu-Dinh would have impacted his opinion. (J. Stip. at 4); see Reddick v. Colvin, No. 16cv00029 BTM(BLM), 2016 WL 3854580, at *3 (S.D. Cal. July 15, 2016) (one doctor's review of entire record was not specific and legitimate reason to reject another doctor's opinion because ALJ did not "point to any specific part of the record" reviewed by former doctor and not other that undermined opinion).[9] Though the ALJ may have erred in this regard, any error was harmless because he identified and explained a specific and legitimate reason for rejecting Dr. Vu-Dinh's opinion, inconsistency with the objective medical evidence, as already discussed. See DeBerry v. Comm'r of Soc. Sec. Admin., 352 F. App'x 173, 176 (9th Cir. 2009); Bartels v. Colvin, No. CV 15-5144 AFM, 2016 WL 768851, at *4 (C.D. Cal. Jan. 29, 2016). Remand is therefore unwarranted on this ground.

---

[9] The additional evidence included a September 2014 treatment record in which Plaintiff was seen by a vascular surgeon. (AR 569-71.) The surgeon concluded, "[b]ased on [Plaintiff's] clinical scenario and physical exam as well as a duplex ultrasound," that his alleged lower-extremity symptoms — calf cramping and intermittent weakness with walking — "[were not] necessarily related to his arterial disease." (AR 570.) While that note seems to suggest Plaintiff's peripheral arterial disease was less severe than assessed by Dr. Vu-Dinh, the surgeon's finding that Plaintiff had "significant blockage on the right" suggests Plaintiff had poor blood flow, which may have supported Dr. Vu-Dinh's opinion. (See id.)

B.  **The ALJ Properly Determined that Plaintiff Could**
**Perform His Past Relevant Work**

Plaintiff argues that the ALJ's RFC determination conflicts with his past relevant work as a proof-machine operator.  (J. Stip. at 9.)  In particular, he alleges that a proof-machine operator's duties included operating machinery (id. at 8-9) and that this requirement diverged from his RFC, which specified "in no uncertain terms[] that he may not operate 'machinery'" (id. at 9).  Plaintiff contends that "neither the VE nor the ALJ explained this deviation from the DOT."  (Id.)  But Plaintiff is mistaken, as no such deviation exists.

1.  <u>Applicable law</u>

At step four of the five-step disability analysis, a claimant has the burden of proving he cannot return to his past relevant work, as both actually and generally performed in the national economy.  § 416.920(f); <u>Pinto v. Massanari</u>, 249 F.3d 840, 844 (9th Cir. 2001).  Although the burden of proof lies with the claimant, the ALJ still has a duty to make factual findings to support his conclusion.  <u>Pinto</u>, 249 F.3d at 844.  In particular, the ALJ must make "specific findings of fact" as to "the individual's RFC," "the physical and mental demands of the past job/occupation," and whether "the individual's RFC would permit a return to his or her past job or occupation."  <u>Ocequeda v. Colvin</u>, 630 F. App'x 676, 677 (9th Cir. 2015) (citing SSR 82-62, 1982 WL 31386, at *4 (1982)).

To ascertain the requirements of occupations as generally performed in the national economy, the ALJ may rely on VE testimony or information from the DOT.  SSR 00-4P, 2000 WL

1898704, at *2 (Dec. 4, 2000) (at steps four and five, SSA relies "primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy" and "may also use VEs . . . at these steps to resolve complex vocational issues"); SSR 82–61, 1982 WL 31387, at *2 (Jan. 1, 1982) ("The [DOT] descriptions can be relied upon — for jobs that are listed in the DOT — to define the job as it is <u>usually</u> performed in the national economy." (emphasis in original)).

When a VE provides evidence at step four or five about the requirements of a job, the ALJ has a responsibility to ask about "any possible conflict" between that evidence and the DOT.  <u>See</u> SSR 00-4p, 2000 WL 1898704, at *4; <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152-54 (9th Cir. 2007) (holding that application of SSR 00-4p is mandatory).  When such a conflict exists, the ALJ may accept VE testimony that contradicts the DOT only if the record contains "persuasive evidence to support the deviation."  <u>Pinto</u>, 249 F.3d at 846 (citing <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1435 (9th Cir. 1995)); <u>see also</u> <u>Tommasetti</u>, 533 F.3d at 1042 (finding error when "ALJ did not identify what aspect of the VE's experience warranted deviation from the DOT").

2.  <u>Relevant background</u>

At his February 2015 hearing, Plaintiff testified that he last worked as a "sorter[] operator" for a credit union, where he "process[ed] checks."  (AR 587-88.)  As summarized by the ALJ, in that position Plaintiff "received items from the proofs order, read[] the item, and balance[d] the bank and reconcile[d] the bank."  (AR 26.)  "[H]e had to key in information into the

22

computers and/or physically put the checks in the machine, of which 40 percent of his time []he claimed he was standing, [and] sat while doing data entry, which was 60 percent of that job." (AR 26-27; see also AR 587-93.) The VE stated that such a job, also referred to as a "checks processing machine [clerk]," was best classified under the DOT as a "proof-machine operator." (AR 589, 594; see also AR 27.)

At the July 2015 hearing, the ALJ "ma[d]e sure [that the VE's] testimony [was] consistent with the [DOT]" and posed to the VE a hypothetical person who could, among other limitations, "never [operate] moving mechanical parts or machinery." (AR 27-28.) The VE found that such a person would be able to do Plaintiff's past relevant work as a proof-machine operator, "[b]oth as per the DOT and as performed." (AR 28.) The ALJ requested that the VE "please let [him] know" "if [he] disagree[d] with the DOT." (AR 27.) The VE did not express any such belief. (See generally AR 26-32.)

3. <u>Analysis</u>

The ALJ assessed Plaintiff with an RFC in which he could not "operate moving mechanical parts or machinery." (AR 12.) He further found that Plaintiff could perform his past relevant work as a proof-machine operator, as actually and generally performed in the national economy. (AR 17.) A proof-machine operator must "operate[] machines" but not moving mechanical parts. See DOT 217.382-010, 1991 WL 671944 ("Moving Mech. Parts: Not Present — Activity or condition does not exist[.]"). Plaintiff's description of his work as actually performed also did not involve any moving machinery. (See AR 587-93.) Thus, because

Plaintiff's past relevant work did not require that he operate moving mechanical parts or machinery, which was precluded in his RFC, the ALJ did not err. See Anderson v. Astrue, No. ED CV 10-01941-VBK, 2011 WL 4344144, at *1 (C.D. Cal. Sept. 16, 2011) (finding no error when RFC "precluded Plaintiff, in part, from working with moving machinery" and "Plaintiff's [past relevant work] as mail clerk . . . d[id] not require that the person work around moving machinery"); Malgra v. Astrue, No. ED CV 11-0724-SP, 2012 WL 443741, at *4 (C.D. Cal. Feb. 10, 2012) (finding "no inconsistency" between RFC precluding plaintiff from operating "hazardous" machinery, which included "moving mechanical parts of equipment," and his past relevant work as fast-food worker, which "d[id] not involve moving mechanical parts" or other hazards).

Plaintiff contends that "moving" in the RFC modified only "mechanical parts," not "machinery," and that Plaintiff was therefore precluded from operating any machine. (See J. Stip. at 7-9.) That is incorrect as a matter of textual construction. See Altera Corp. v. PACT XPP Tech., AG, No. 14-cv-02868-JD, 2015 WL 4999952, at *4 (N.D. Cal. Aug. 21, 2015) (noting that "modifiers appearing before a listing are often read to modify each element"); Ward Gen. Ins. Servs., Inc. v. Emp'rs Fire Ins. Co., 114 Cal. App. 4th 548, 554 (Ct. App. 2003) ("Most readers expect the first adjective in a series of nouns or phrases to modify each noun or phrase in the following series unless another adjective appears."); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive . . . modifier

normally applies to the entire series."). Plaintiff's RFC, then, prohibited the operation of "moving mechanical parts" and "moving machinery" and did not preclude the use of machines altogether. (See AR 12); Wigmore v. Colvin, No. 6:12-cv-0611-ST, 2013 WL 1900621, at *18 (D. Or. Apr. 16, 2013) ("ALJ's hypothetical to the VE limited the use of 'moving or otherwise dangerous machinery,' as opposed to 'machines' or 'machinery' generally."), accepted by 2013 WL 1900617 (D. Or. May 7, 2013). This conclusion is bolstered by the ALJ's unchallenged finding in the RFC that Plaintiff could "occasionally operate motor vehicles" (AR 12), which are certainly "machines."

And while a proof-machine operator must necessarily operate machines, the DOT makes clear that "[m]oving" mechanical parts or machinery are not involved in that process; thus, no conflict exists. See Anderson, 2011 WL 4344144, at *1 (mail-clerk work did not conflict with RFC prohibiting "moving machinery," even though it "could require use of machinery"); Wigmore, 2013 WL 1900621, at *18 ("The mere fact that [plaintiff's jobs] require the use of a machine does not render the VE's testimony inconsistent with the limitations in the hypothetical [precluding moving machinery], especially in light of the DOT descriptions which specifically exclude the use of 'moving mechanical parts.'" (emphasis in original)).

Thus, Plaintiff has failed to allege a conflict between the ALJ's RFC determination and his past relevant work as a proof-machine operator. The ALJ therefore properly relied on the VE's testimony in concluding that Plaintiff could perform his past relevant work even with an RFC precluding him from "moving

mechanical parts or machinery."[10] (See AR 27-28 (confirming that VE's testimony was "consistent with the Dictionary of Occupational Titles")); <u>Dewey v. Colvin</u>, 650 F. App'x 512, 514 (9th Cir. 2016). Accordingly, remand is unwarranted on this ground.

## VI. CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[11] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's

---

[10] Plaintiff probably couldn't perform his past relevant work as actually performed, however, despite the lack of conflict regarding "moving mechanical parts or machinery." As a proof-machine operator, he testified, he stood "40 percent" of the time, or 3.2 hours in an eight-hour workday. (See AR 592.) But his RFC limited him to standing and/or walking for only two hours a day, or 25 percent of the time. (AR 12.) Apparently, then, Plaintiff could not perform his past relevant work as actually performed, and the ALJ likely erred in that regard. As generally performed, however, proof-machine operator is defined as "Sedentary Work," involving standing or walking for only "brief periods of time." See 1991 WL 671944. Thus, the ALJ's step-four finding that Plaintiff could perform his past relevant work was ultimately consistent with the RFC, and any error was harmless. See, e.g., Pierce v. Astrue, No. CV 09-8177 RNB, 2010 WL 2998887, at *1 (C.D. Cal. July 30, 2010) ("[T]he determination that a claimant is capable of performing his/her past relevant work properly may be based on either the past relevant work as performed by the claimant or the past relevant work as generally performed in the national economy." (emphasis in original)).

[11] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

request for remand, and DISMISSING this action with prejudice.

DATED: February 5, 2018 _____
JEAN ROSENBLUTH
U.S. Magistrate Judge